**In the United States District Court**
**for the District of Kansas**

————————

Case No. 22-cv-2276-TC

————————

ROGELIO GARCIA VALDEZ, ET AL.,

*Plaintiffs*

v.

SIGNATURE LANDSCAPE, LLC,

*Defendant*

————————

## MEMORANDUM AND ORDER

Plaintiffs Rogelio Garcia Valdez and Marbella Gomez brought this collective and class action against Signature Landscape, LLC, alleging that Signature violated the overtime provisions of the Fair Labor Standards Act and the Missouri Minimum Wage Law. Doc. 9. Four motions are now pending. For the following reasons, Signature's motion to decertify, Doc. 219, is denied, the plaintiffs' motion for class certification, Doc. 217, is granted, the plaintiffs' motion for partial summary judgment, Doc. 227, is denied, and Signature's motion for summary judgment, Doc. 229, is denied.

## I

## A

Each motion has a different standard that governs resolution. The following describes each applicable standard.

**1.** Signature moves to decertify the Fair Labor Standards Act collective. Doc. 219. The FLSA authorizes employees to bring collective actions on behalf of "similarly situated" employees. 29 U.S.C. § 216(b). Unlike a class certified under Rule 23, an FLSA collective is provisional. At the outset, the collective is certified on a preliminary basis so that notice can be sent to potential opt-in plaintiffs. *Thiessen v. Gen. Elec.*

1

*Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). That preliminary certification reflects only that the plaintiffs have made "substantial allegations" that they are similarly situated. *Id.* Conditional certification was granted here in December 2023. Doc. 68. That preliminary certification is not a final determination that the plaintiffs are similarly situated, rather it reflects only that the plaintiffs have made "substantial allegations" to that effect. *Id.*

Once discovery is complete and the benefit of a developed factual record exists, the defendant may move to decertify or, in other words, dissolve the collective on the ground that the plaintiffs are not, in fact, similarly situated. *Thiessen*, 267 F.3d at 1102–03. The inquiry, under the ad-hoc approach followed here, then proceeds under a stricter standard, guided by three considerations: the disparate factual and employment settings of the individual plaintiffs, the defenses that appear individual to each plaintiff, and fairness and procedural considerations.[1] *Id.* at 1103. These considerations are not a rigid test. The decision whether to maintain or decertify a collective is committed to the broad discretion of the district court. *Id.* at 1102.

**2.** The plaintiffs also move to certify a class for their state-law claims. Doc. 217. "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To meet that exception, "a party seeking to maintain a class action must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Id.* (citation and quotation marks omitted).

Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff requesting class certification "must be prepared to prove . . . in fact" that each requirement is met. *Id.* (emphasis omitted). That may require a court to "'probe behind the pleadings' and examine the facts and evidence in the case." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227–28 (10th Cir. 2013) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also*

---

[1] *Thiessen*, 267 F.3d at 1102–05, did not mandate the ad-hoc approach to the "similarly situated" inquiry. But this Memorandum and Order applies it because it was the standard used at the stage of conditionally granting certification, Doc. 68, the parties relied on it in their briefing, and no Tenth Circuit authority has required otherwise.

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021). Even so, consideration of the merits on a motion for class certification is limited to "determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Rule 23(a) delineates four prerequisites for class certification: numerosity, commonality, typicality, and adequate representation. *See* Fed. R. Civ. P. 23(a). Certification is proper only if a district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350–51). If the prerequisites are met, a movant must then "satisfy through evidentiary proof" at least one of the defined classes under Rule 23(b). *Id.*

**3.** And finally, each party contends that it is entitled to summary judgment. Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

When the moving party does not bear the burden of proof at trial, that party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of

law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

The filing of cross-motions for summary judgment does not alter this standard. Each motion—and its material facts—must "be treated separately," meaning that "the denial of one does not require the grant of another." *Atl. Richfield Co. v. Farm Credit Bank Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). All inferences must be construed "in favor of the party against whom the motion under consideration is made." *United States v. Dep't of Health & Env't*, 162 F.4th 1238, 1247 (10th Cir. 2025).

**B**

This case presents a relatively simple question with a complex factual backdrop. The FLSA, as noted, generally requires an employer to pay overtime but exempts any employee whose hours are subject to regulation by the Secretary of Transportation under the Motor Carrier Act. 29 U.S.C. § 213(b)(1). In practice, the Motor Carrier Act exemption covers employees of motor carriers whose work directly affects the safe operation of commercial motor vehicles in interstate commerce. *See Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154 (10th Cir. 2016); *see also Williams v. Cent. Transp. Int'l, Inc.*, 830 F.3d 773, 775 (8th Cir. 2016).

The plaintiffs are landscape laborers. Signature has never paid overtime to any of its landscape laborers, relying on the Motor Carrier Act's exemption on the theory that their work affects the safe operation of commercial motor vehicles in interstate commerce. But the plaintiffs contend this is unlawful because they spend the vast majority of their time on manual landscaping tasks unrelated to vehicle safety.

The plaintiffs bring overtime claims under both the FLSA and the Missouri Minimum Wage Law. The Missouri Minimum Wage Law independently requires overtime for hours worked in excess of forty per week. Mo. Rev. Stat. § 290.505. The dispute also implicates certain representations Signature made to the Department of Labor in its H-2B visa applications, in particular, Signature's statements that the plaintiffs would be paid overtime and certain representations made in a 2021

DOL audit of Signature's pay practices. The following describes the relevant factual background and procedural history.

**1.** The Motor Carrier Act exemption turns on whether an employer is a motor carrier whose employees' work affects the safe operation of vehicles in interstate commerce. *Deherrera*, 820 F.3d at 1154. Signature is a commercial landscaping company that operates in the Kansas City metropolitan area from four branches: two in Kansas (Olathe and Kansas City) and two in Missouri (Kansas City and Grandview). Doc. 232 at 2, ¶ 3.[2] Signature is registered with the United States Department of Transportation (DOT) as a motor carrier. *Id.* at 10, ¶ 29. Given the proximity of Signature's branches to the Kansas-Missouri state line and the geographic scope of its client base, Signature's crews routinely transport landscaping equipment and materials across state lines in the ordinary course of business. Doc. 222 at ¶ 2(a)(viii).

Signature employs four categories of field workers: Crew Member, Crew Lead, Driver, and Driver-Lead. Doc. 220-3 at ¶¶ 3–4. Signature assigns its field workers to one of five departments: landscape construction, irrigation, lawn maintenance, applications, or horticulture. *Id.* The parties refer to these field employees collectively as "landscape laborers," a term that corresponds to the "Crew Member" title used in Signature's internal job descriptions. Doc. 228 at 6, ¶ 15. More than 800 field employees have worked in these roles since July 2019. Doc. 220-3 at ¶¶ 3–4.

Since its founding in 1989, Signature has classified all field employees as exempt from the FLSA's overtime requirements pursuant to the Motor Carrier Act exemption. Doc. 228 at 3, ¶ 4. Signature has paid all field employees on an hourly basis at their regular rate for all hours worked, including over forty in a week; it has never paid overtime. Doc. 222 at ¶ 2(a)(iv). Signature's founder testified that he consulted with an attorney at the company's inception and relied on the Motor Carrier Act exemption in making this classification. Doc. 232 at 6, ¶ 2. Other attorneys subsequently reviewed and confirmed the classification. *Id.* at 6, ¶ 3.

---

[2] All references to the parties' briefs are to the page numbers assigned by CM/ECF. To the extent a fact is genuinely disputed, that dispute will be noted and, where appropriate, viewed in the light appropriate for that motion. *Dep't of Health & Env't*, 162 F.4th at 1247.

In 2021, the Department of Labor's Wage and Hour Division investigated Signature's pay practices. Doc. 222 at ¶ 2(a)(vi). Signature contends that the Wage and Hour Division reviewed pay data for all field employees, interviewed employees in field roles, considered Signature's reliance on the Motor Carrier Act exemption, and determined that Signature had not violated the FLSA. Doc. 232 at 9–10, ¶¶ 25, 27; Doc. 220-48 at No. 3; Doc. 230-11 at 54:4–55:20. The plaintiffs disagree. They contend that the audit was limited, investigating only employees who drove vehicles and not extending to non-driver landscape laborers who performed manual labor. Doc. 231 at 13, ¶ 45; Doc. 231-2 at 135:2–136:8.

Signature's interactions with the DOL extended beyond the 2021 audit. As a participant in the federal H-2B visa program, Signature filed applications with the DOL describing the duties and terms of employment for its landscape laborers. Doc. 232 at 3–4, ¶¶ 11, 16. Those applications, submitted under penalty of perjury, represented that employees would be paid overtime. Doc. 228-3 at 113:22–114. The plaintiffs contend these representations were inconsistent with Signature's longstanding practice of not paying overtime. Doc. 228 at 10–11, ¶¶ 27–28. Signature contends that the function of the DOL's online portal required it to represent that it was paying its employees overtime, in particular, the portal required applicants to enter an overtime rate and produced an error message if they did not, making the entries a product of the portal's flawed design rather than an affirmative substantive representation. Doc. 224-3 at ¶ 5; Doc. 232 at 22–23. After 2023, Signature revised its H-2B applications to reference the Motor Carrier Act exemption, and the DOL continued approving those applications. Doc. 232 at 8, ¶¶ 17, 19.

**2.** Two named plaintiffs bring this action. Rogelio Garcia Valdez was a driver in Signature's landscape construction department. Doc. 232 at 7, ¶ 10. Valdez drove Signature's commercial motor vehicles daily. He estimates that it typically takes 15 to 30 minutes to reach a customer site, though he testified that trips of 1.5 to 2 hours occur roughly once per year. Doc. 231 at 3–5, ¶¶ 9, 13, 21.

Each morning, Valdez loaded his truck with construction equipment and materials, and he confirmed load security before departure. Doc. 231 at 4–5, ¶¶ 17–23. He was subject to DOT compliance requirements, including maintaining a DOT medical card, completing daily Driver's Vehicle Inspection Reports, and completing road test and motor vehicle record certifications. *Id.* at 5, ¶ 16. Valdez lives in

6

Kansas, but Signature's daily timekeeping records reflect that he performed approximately 29% of his work in Missouri. Doc. 218 at 4–5, ¶¶ 52, 80; Doc. 226 at 2, 5. The plaintiffs contend that approximately 93% of Valdez's workday was spent performing manual landscape labor, including planting, grading, and installing hardscaping. Doc. 218 at 4, ¶ 8.

The other plaintiff, Marbella Gomez, was a crew member who worked in Signature's horticulture and construction departments. Doc. 220 at 2. Gomez never drove Signature's commercial motor vehicles. Doc. 231 at 5, ¶ 30. Gomez testified that her crew leader loaded the truck before she arrived in the morning, that she never helped with the morning loading process at Signature's branches, that she did not assist with driving the vehicle, that she did not place safety cones, and that she was unfamiliar with company safety policies. Doc. 231 at 5–6, ¶¶ 33–34; Doc. 224-5 at 32:1–14, 82:21–25, 83:1–8. Gomez acknowledges that she was required to ride in Signature's commercial motor vehicles to client sites and that she loaded and unloaded landscaping equipment at client sites and used tarps to secure items in the truck bed. Doc. 231 at 5, ¶ 33. She also testified to checking truck lights and advising drivers when lights were not working. Doc. 224-5 at 57:17–58:11. Gomez spent approximately 50 minutes per week on the road. Doc. 220-33 at 80:22–81:16. Gomez stopped working for Signature in June 2022. Doc. 231 at 5, ¶ 28.

**3**. Familiarity with the procedural history of this case is presumed and will not be unnecessarily repeated. *See* Docs. 68, 220, 237. Of particular relevance here are four pending motions: Signature moves to decertify the FLSA collective, Doc. 219; the plaintiffs move for Rule 23 class certification of their Missouri Minimum Wage Law claims, Doc. 217, and for partial summary judgment on quasi-estoppel, Doc. 227; and Signature moves for summary judgment on all of the named plaintiffs' claims, Doc. 229. The parties also dispute the proper sequencing of how to rule on these motions. Doc. 222 at 14 n.4; Doc. 232 at 23–24; Doc. 235 at 14–15. And one additional procedural fact bears noting: While Gomez was added as a named plaintiff through the Amended Complaint, Doc. 9, she has never filed a separate written consent to join the FLSA collective, which is an issue that becomes significant in the analysis that follows.

## II

All told, there are four pending motions and a series of related is-sues. The analysis proceeds in four parts. Section II.A addresses a threshold sequencing dispute. Section II.B resolves Signature's motion to decertify the FLSA collective. Section II.C addresses the plaintiffs' motion for Rule 23 class certification of the Missouri Minimum Wage Law claims. Section II.D turns to the parties' cross-motions for sum-mary judgment.

**A**

As a matter of sequencing, Signature argues that it is necessary to rule on class certification before deciding the plaintiffs' summary judg-ment motion. Doc. 232 at 23–24; Doc. 222 at 14 n.4. In support of its argument, Signature invokes the one-way intervention doctrine. *Id.* This doctrine provides that the merits of a class action should not be adjudicated until after the class has been certified and its members no-tified so that absent class members must decide whether to participate before they know the outcome. *See Schwarzschild v. Tse*, 69 F.3d 293, 295–96 (9th Cir. 1995).

Neither binding precedent nor the one-way intervention doctrine requires deferring a ruling on summary judgment. The Tenth Circuit has not squarely addressed whether the doctrine compels a particular sequencing. *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, No. 08-1330, 2015 WL 790081, at *1 (D. Kan. Feb. 25, 2015) (not-ing that the Tenth Circuit has not addressed the issue). But it has, with-out expressing any one-way intervention concern, affirmed a district court's decision that resolved a summary judgment motion before class certification where the defendant moved for summary judgment first. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1191, 1207–08 (10th Cir. 2015).

And even if the doctrine applied, it would not compel the result Signature seeks. That is because Signature moved for summary judg-ment before certification, Doc. 229, which upends the rationale for the doctrine and waives its right to insist on one-way intervention. *See Schwarzschild*, 69 F.3d at 297 (holding that the rationale for forbidding pre-certification merits rulings "disappears when the defendant him-self moves for summary judgment before a decision on class certifica-tion"); *Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1382 (D.C. Cir. 1980) (same); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 757 (3d Cir. 1974) (same). Accordingly, this Memorandum and Order proceeds to

address the certification, decertification, and summary judgment motions jointly.

**B**

As noted, conditional certification of the FLSA collective was previously granted. Doc. 68. Signature moves to decertify. Doc. 219. But, on balance, application of the three factors identified in *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)—namely, the disparate factual and employment settings of the individual plaintiffs, the defenses that appear individual to each plaintiff, and fairness and procedural considerations—do not favor decertification. Thus, Signature's motion is denied.

**1.** The first *Thiessen* consideration, disparate factual and employment settings, favors the plaintiffs. It asks whether the plaintiffs share sufficiently similar factual and employment settings to justify collective treatment. *Thiessen*, 267 F.3d at 1102–03. This does not require that every plaintiff occupied the same position, worked at the same location, or experienced the same adverse action. Rather, the inquiry focuses on whether the plaintiffs' claims arise from a common factual nucleus, like a shared policy, plan, or decision, such that the legal questions generated by their claims substantially overlap. *See id.* at 1105–06. Where the employer applied a single, uniform policy to all members of the collective, variations in how that policy played out for individual employees go to the strength of each plaintiff's claim on the merits, not to whether the plaintiffs are similarly situated for purposes of Section 216(b). *See id.* at 1107 (faulting the district court for treating merits questions about the link between the common policy and individual employment decisions as grounds for decertification rather than as issues for the jury).

In this case, there is a single legal question that unites the collective. That question is whether Signature's blanket classification of every landscape laborer as Motor Carrier Act exempt was lawful. The answer turns on whether these workers' duties directly affected the safe operation of motor vehicles in interstate commerce. *See Deherrera,* 820 F.3d at 1154; *Williams*, 830 F.3d at 775. And it is common to all plaintiffs.

Signature attempts to undermine this result by identifying variations among the plaintiffs. In particular, Signature identifies six categories of variation: the presence of both drivers and non-drivers, differences in road time, loading experiences, pre-trip inspections, non-

driver assistance duties, and safety training. Doc. 220 at 17–27. But these differences do not suggest that there are separate legal questions or policies. Rather, the variations Signature identifies go to the evidence that individual workers may offer in answering the same question. This might have bearing on the merits of the underlying claims, but it does not go to the question of whether the plaintiffs are similarly situated for purposes of Section 216(b). *See Thiessen*, 267 F.3d. at 1107; *see also Gomez v. Epic Landscape Prods., L.C.*, No. 22-2198, 2024 WL 4605146, at *3–4 (D. Kan. Oct. 29, 2024) (finding landscape laborers similarly situated despite variations in individual duties because all challenged the same blanket Motor Carrier Act exemption classification).

Signature also contends that applying the Motor Carrier Act exemption requires separate legal tests for drivers, driver's helpers, and loaders. Doc. 220 at 18. Under its view, the collective must be subdivided because "the analysis for drivers is different from for loaders is different from helpers, and so on." *Id.* at 18. But the question is whether the employee's work directly affected the safe operation of motor vehicles in interstate commerce. *See Deherrera,* 820 F.3d at 1154; *Williams*, 830 F.3d at 775. That question is far more susceptible to common proof than the multi-factor tests at issue in the cases Signature cites.

Signature's cases illustrate the contrast by relying on cases that had to evaluate a multi-factor test. In *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1098–1103 (D. Kan. 2012), for example, the court decertified a collective of store managers challenging the executive and administrative exemptions under 29 C.F.R. § 541, which is a multi-factor test that yielded different results for each manager depending on individual duties and authority. So, too, in *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1002–13 (D. Kan. 2018), where the court decertified a collective challenging independent contractor classifications under the "economic realities" test, which is a six-factor balancing inquiry that produced different answers for nearly every plaintiff. Neither test resembles the singularly focused Motor Carrier Act exemption. *See Gomez*, 2024 WL 4605146, at *4.

**2**. The individualized defense factor also favors the plaintiffs. This consideration examines whether the defenses available to the employer are so individualized to each plaintiff that collective adjudication would devolve into a series of separate trials. *Thiessen*, 267 F.3d at 1102–03. The presence of some individualized defenses does not automatically warrant decertification. Recall that the Tenth Circuit reversed the

district court's decertification in *Thiessen* even though the employer had asserted "highly individualized" defenses to each plaintiff's claim, reasoning that those defenses were directed at the individual merits of each plaintiff's case and did not outweigh "any potential benefits in proceeding as a collective action." *Id.* at 1107. Although *Thiessen*'s specific discussion of individualized defenses arose in the context of a pattern-or-practice claim, the underlying principle applies more broadly. *See id.* The question is not whether any defense might require some individualized proof, but whether the weight and character of those defenses are so predominant and individualized that they would negate the efficiencies of collective treatment. *See id.*

Signature's only defense is the statute of limitations. FLSA claims carry a two-year default limitations period that extends to three years only upon proof that the violation was willful. 29 U.S.C. § 255(a). Signature argues that because some opt-ins' claims survive only under the three-year period, individual willfulness determinations would be required. Doc. 220 at 27–28. But that will not affect a collective claim: Willfulness focuses on the employer's conduct; it does not consider individual attributes of the employees. *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)) (noting that the relevant test is whether the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute" which is a question directed at the employer's state of mind).

The evidence here is quintessentially common. It will focus on Signature's uniform classification policy, H-2B representations, and a 2021 DOL audit. Doc. 223 at 15–16; Doc. 220 at 27–28. None of it varies by plaintiff. Whether Signature knew or recklessly disregarded whether its blanket classification was prohibited by the FLSA is an inherently unitary question amenable to a single trial presentation.

Notably, this conclusion is consistent with *Gomez*. That court rejected a materially identical statute-of-limitations argument, finding that the defendant failed to show that limitations-period variations "render collective treatment of the FLSA claims unmanageable or inefficient." 2024 WL 4605146, at *7. Other courts have reached the same conclusion. *See Guy v. Absopure Water Co., LLC*, No. 20-12861, 2023 WL 5953225, at *6 (E.D. Mich. Sept. 12, 2023); *Senegal v. Fairfield Indus., Inc.*, No. 16-2113, 2018 WL 6079354, at *11 (S.D. Tex. Nov. 21, 2018).

The cases cited by Signature on this point do not require a different result. In *Blair*, the limitations issue was present, but it merely added to the multiple other individualized problems at issue there, which is a fundamentally different and more granular inquiry than the Motor Carrier Act exemption analysis. 309 F. Supp. 3d at 1009–12. And *Solis v. La Familia Corp.*, No. 10-2400, 2013 WL 589613 (D. Kan. Feb. 14, 2013), is inapposite. That case was a DOL enforcement action, not a collective action, and the court's discussion of willfulness went to whether the DOL had carried its evidentiary burden on the merits, not to whether individualized willfulness inquiries would render collective treatment unmanageable. *Id.* at \*7. *Solis* says nothing about the manageability question Signature raises here.

**3.** The fairness and procedural considerations also favor the plaintiffs. This factor considers whether collective treatment serves the interests of fairness and procedural efficiency. *Thiessen*, 267 F.3d at 1102–03. As part of this, courts also consider whether proceeding collectively would confuse the jury, impose undue burdens on either party, or create unfair prejudice. *Id.* at 1103.

The record developed through discovery suffices to permit fair resolution of the collective's claims through representative proof. The 43 depositions cover 27% of the collective and were conducted under a discovery plan the parties jointly designed with each side selecting 22 of the 43 deponents pursuant to the Phase II Scheduling Order. Doc. 125. That sample is adequate. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455–59 (2016) (endorsing representative evidence in FLSA cases); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 (11th Cir. 2008) (affirming verdict based on seven representatives for 1,424 opt-ins); *Monroe v. FTS USA, LLC*, 860 F.3d 389, 410 (6th Cir. 2017) (affirming district court's decision that 17 testifying technicians supported a verdict for 293 opt-ins).

Signature's contrary argument—that proceeding collectively would devolve into 150-plus mini-trials—misapprehends the concept of representative proof. *Contra* Doc. 220 at 28–29. Signature is critical not of how the trial would unfold (which is what this factor considers), but of how the discovery framework was designed.

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774–76 (7th Cir. 2013), which Signature cites, is distinguishable. There, counsel refused to propose a feasible trial plan and could not explain how representative witnesses were selected. 705 F.3d at 774–76. But, here, the

discovery framework was jointly designed and Signature cannot credibly attack it. *See Monroe*, 860 F.3d at 410–11.

Moreover, the practical circumstances of this collective independently weigh against decertification. The core objectives of Section 216(b)—namely, lowering costs through pooled resources and resolving common issues efficiently—are also strongly served here. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). The collective consists substantially of non-English-speaking H-2B visa workers, many of whom have returned to foreign countries. Doc. 223 at 17–21. For these plaintiffs, decertification would not merely inconvenience them, it would effectively extinguish their claims. *See, e.g.*, *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (noting that "the class action device is especially pertinent to vulnerable populations" and that class members who reside abroad, lack English proficiency, and have limited knowledge of the legal system would face "significant hurdles to adjudicate their individual claims"). As the *Albelo* court observed in a closely related case, individual trials "would not improve the quality of justice, but would waste judicial resources" by requiring "approximately 100 jury trials, involving approximately 5,000 prospective jurors." *Albelo v. Epic Landscape Prods., L.C.,* No. 17-0454, 2021 WL 2213305, at *3 (W.D. Mo. June 1, 2021). The *Gomez* court reached the same conclusion on virtually identical facts, finding collective treatment "a fair and efficient way to resolve the parties' dispute." 2024 WL 4605146, at *8.

\* \* \*

All three *Thiessen* ad-hoc considerations favor maintaining the collective. Accordingly, Signature's Motion to Decertify, Doc. 219, is denied.

## C

The plaintiffs move to certify a class under Rule 23(b)(3) to pursue overtime claims under the Missouri Minimum Wage Law, Mo. Rev. Stat. § 290.500 *et seq.* Doc. 217. The first section evaluates a threshold question about the Missouri statute applicable to the class. The second section then turns to the Rule 23(a) prerequisites. Next, the third section focuses on Rule 23(b)(3) requirements. And finally, the fourth section focuses on Rule 23(g)'s adequacy of counsel question. The plaintiffs satisfy all Rule 23 requirements, and thus their class is certified and their proposed class representative and counsel are appointed.

**1**

A threshold issue concerning the Missouri statute requires resolution. The plaintiffs seek to define the class to include all landscape laborers who performed work in Missouri, regardless of where they start the day. Doc. 218 at 27. Signature responds that the Missouri Minimum Wage Law has no extraterritorial reach and cannot apply to employees based in Kansas. Doc. 224 at 9. The question, then, is whether the statute covers hours physically worked in Missouri by employees who commute into the state from Kansas. But neither the Missouri Supreme Court nor any Missouri appellate court has squarely addressed it.

The task of a federal court in such a position is to predict how the Missouri Supreme Court would answer the question. *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 (10th Cir. 2007). Thus, courts must interpret a state statute "according to state rules of statutory construction," *id.*, and extrapolate its meaning "according to traditional rules of statutory construction," *Phelps v. Hamilton*, 59 F.3d 1058, 1070 (10th Cir. 1995).

The Missouri Supreme Court instructs that "[t]he goal of statutory interpretation is to give effect to the General Assembly's intent 'as reflected in the plain language of the statute at issue.'" *Mo. State Conf. of Nat'l Ass'n for the Advancement of Colored People*, 607 S.W.3d 728, 732 (Mo. 2020) (quoting *Ivie v. Smith*, 439 S.W.3d 189, 202 (Mo. 2014)); *see also Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 665 (Mo. 2010). Words in a statute are read not in isolation but rather in the context of the whole statute to determine their plain and ordinary meaning. *Union Elec. Co. v. Dir. of Revenue*, 425 S.W.3d 118, 122 (Mo. 2014). "Absent express definition, statutory language is given its plain and ordinary meaning, as typically found in the dictionary." *State v. Brookside Nursing Ctr., Inc.*, 50 S.W.3d 273, 276 (Mo. 2001). The rules of statutory construction apply if the statute is ambiguous. *Kehlenbrink v. Dir. of Revenue*, 577 S.W.3d 798, 800 (Mo. 2019).

Starting with the statute's text, the operative term "Employee" does not reference the employee's state of residence. *Cf. Riley v. Bondi*, 606 U.S. 259, 274 (2025) (beginning statutory construction with the text). Rather, "Employee" is defined as "any individual employed by an employer," subject only to enumerated functional exclusions—executives, volunteers, commissioned salespeople, and the like. Mo. Rev.

14

Stat. § 290.500(3). Nothing references the employee's state of residence.

Nor do the surrounding provisions mandating overtime payment reference residency. *Cf. Env't Prot. Agency v. Calumet Shreveport Ref., L.L.C.*, 145 S. Ct. 1735, 1750 (2025) (noting that words must be read "in their context and with a view to their place in the overall statutory scheme"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). In this case, the mandate for overtime payment itself has no geographic limitations: "No employer shall employ any of his employees for a workweek longer than forty hours" without overtime compensation. Mo. Rev. Stat. § 290.505(1).

That silence is notable because elsewhere in the same chapter the Missouri Legislature included geographic qualifiers to limit a provision's reach. Section 290.528, which preempts political subdivisions from establishing minimum wages or employment benefits exceeding state law, defines "Employee" as "an individual employed *in this state* by an employer." Mo. Rev. Stat. § 290.528(1) (emphasis added). "[W]here [a legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco, Cal. v. Env't Prot. Agency*, 604 U.S. 334, 344 (2025); Scalia & Garner, *Reading Law* at 107. The omission of any comparable language from the Missouri Minimum Wage Law's core definitional language in Section 290.500 is presumed intentional, *see id.*, and favors its application to nonresidents of Missouri performing labor in the state.

Other jurisdictions have reached the same conclusion when interpreting analogous statutory language. *Cf. Woolfolk v. St. Louis Cnty.*, 689 S.W.3d 186, 190 (Mo. Ct. App. 2024) (quoting *Mo. Tp., Chariton Cnty. v. Farmers' Bank of Forest Green*, 42 S.W.2d 353, 356 (Mo. 1931)) ("While we are not bound to follow the decisions of a sister state, they are persuasive, if based on sound principles and good reason."). For example, in *Adams v. Catrambone*, 359 F.3d 858 (7th Cir. 2004), the Seventh Circuit held that the Illinois Wage Payment and Collection Act—which applies to "all employers and employees in [Illinois]"—protects "nonresidents of Illinois who work in that state for an in-state employer." *Id.* at 862. The court found this language "sufficiently clear to preclude any need to resort to additional interpretive aids." *Id.* at 864.

15

The California Supreme Court, in *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011), likewise held that California's overtime provisions apply to nonresident employees for work physically performed in California. The court reasoned that California's overtime laws "apply by their terms to all employment in the state, without reference to the employee's place of residence." *Id.* at 241.

The Missouri Minimum Wage Law is, if anything, more favorable to the place-of-performance principle than either the Illinois or California statutes. That is because it contains no "in this state" language at all in its core definitional provisions, which makes a residency-based reading even harder to sustain than in those jurisdictions.

Signature's arguments to the contrary fail. Signature invokes the presumption against extraterritoriality, citing *Tuttle v. Dobbs Tire & Auto Centers, Inc.*, 590 S.W.3d 307, 311 (Mo. 2019). Doc. 224 at 18. That presumption is that Missouri statutes apply only within Missouri's borders and have no extraterritorial effect unless the legislature expressly states otherwise. *Tuttle*, 590 S.W.3d at 312. But Signature's reliance on *Tuttle* is misplaced because, in that case, the plaintiff was an Illinois employee whose "entire work experience occurred in Illinois," meaning that application of Missouri law would have been "purely extraterritorial." *Id.* at 312. In this case, the plaintiffs' claim does not implicate the rule in *Tuttle* because they do not request the Missouri Minimum Wage Law's application to work performed in Kansas; they request its application to work performed in Missouri.

The other authorities Signature invokes are likewise inapposite. For example, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003), and *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 937 (9th Cir. 2019) each addressed one state's attempt to regulate conduct occurring entirely in another state, which is not what is happening here.

Signature's reliance on *Oman v. Delta Air Lines, Inc.*, 466 P.3d 325 (Cal. 2020), and *Bostain v. Food Express, Inc.*, 153 P.3d 846 (Wash. 2007), for a "principal place of work" limitation fares no better. Doc. 224 at 18–20. Neither case construes the Missouri Minimum Wage Law or addresses Missouri law. Each interprets a different state's statute with different textual features, and Missouri courts have never adopted such a test.

16

Moreover, *Bostain*, and *Martinez v. FedEx Ground Package Sys., Inc.*, No. 20-1052, 2022 WL 4464781 (D.N.M. Oct. 27, 2023), addressed whether a worker's home state wage law could reach work performed outside that state. That is a distinct question from the issue presented here: whether a state's wage law reaches non-residents performing work in the state.

\* \* \*

The Missouri Minimum Wage Law covers hours physically worked in Missouri by employees of a Missouri-registered employer, regardless of the employees' state of residence or starting office. The class is defined accordingly. This result is particularly sensible given the geographic realities of this case. Signature operates four branches in the Kansas City metropolitan area—two in Kansas and two in Missouri—and its crews routinely cross state lines in the ordinary course of business. Doc. 218 at 3, ¶ 3; Doc. 222 at ¶ 2(a)(viii).

**2**

Having concluded that the Missouri Minimum Wage Law applies to the named plaintiffs' claims, the next step is to determine whether class certification is appropriate. Rule 23(a) delineates four prerequisites for class certification: numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. P. 23(a). Certification is proper only if a district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 569 U.S. at 33. Based on that analysis, the plaintiffs satisfy all four prerequisites.[3]

**a**

---

[3] The following only applies the Rule 23 analysis to Valdez. Plaintiffs initially proposed both Valdez and Gomez as class representatives but narrowed their request to Valdez in their supporting memorandum. Doc. 226 at 2. Plaintiffs alternatively proposed David Maldonado as class representative in the event the court adopted Signature's position that the Missouri Minimum Wage Law covers only employees who begin their workday from a Missouri office. Doc. 218 at 29–30; Doc. 226 at 10–11. Because, as previously noted, the Missouri Minimum Wage Law covers hours physically worked in Missouri regardless of the employee's starting office, Valdez is a proper class representative, and the alternative proposal need not be reached.

The first inquiry is numerosity. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In addition to promoting efficiency, the numerosity requirement safeguards individual due process rights, balancing the presumption that an individual has a due process right to press his or her own claim with the challenges of adjudicating numerous similar claims. 1 William B. Rubenstein, Newberg & Rubenstein on Class Actions § 3:11 (6th ed. 2022). A plaintiff seeking class certification therefore must justify why joining individual claims is impracticable under the circumstances, meriting class-wide action. *See id.*

Determining whether joinder is impracticable is a fact-specific inquiry that considers the nature of the action, the size of the proposed class, the location or geographic dispersion of class members, and whether members' names are easily ascertainable. *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (citation omitted). There is no magic number of putative class members that automatically satisfies the numerosity requirement. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006). What is important is the totality of circumstances that accompanies the putative class size. *Id.*

Signature does not contest numerosity for the proposed class as a whole, and the record adequately establishes numerosity. For one, the size of the proposed class favors a numerosity finding. The plaintiffs sent their FLSA collective notice to 588 landscape laborers. Doc. 80. There were 159 opt-ins, nearly all of whom—98.75%—performed work in Missouri. Doc. 218 at 27. That figure alone suggests a class too numerous for joinder. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021) (noting that numerosity requirement is not satisfied by a "magic number," but "numerosity is generally presumed at a level of 40 [or more] members"). Nothing suggests the broader pool of 588 landscape laborers who received notice would reflect a materially different rate, given that Signature's four branches straddle the Kansas-Missouri border and its crews routinely cross state lines in the ordinary course of business. Doc. 232 at 2, ¶ 3; Doc. 222 at ¶ 2(a)(viii). Joinder is also impracticable because many putative class members work on temporary visas and have likely returned to their home countries. *See Colo. Cross Disability Coal.*, 765 F.3d at 1215 (10th Cir. 2014) (including "location of the members of the class" as impracticability factor); *see also Phillips v. Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 19-2402, 2023 WL 11984167, at *4 (D. Kan. Aug. 31, 2023) (noting "geographic dispersion" contributes to impracticability).

**b**

The next question is commonality. Rule 23 requires a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To show commonality, the plaintiff must "demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (citation and quotation marks omitted). This means that the claims of the putative class "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Id.* at 350. A contention is of such a nature when "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

The common question here is whether Signature's uniform policy of classifying all landscape laborers under the Motor Carrier Act exemption was lawful. *Accord supra* Section II.B.1 (finding FLSA commonality on this question). Signature applied the Motor Carrier Act exemption as a blanket classification to every landscape laborer without individualized analysis. Signature's own H-2B applications, job postings, and corporate testimony describe identical job duties for all landscape laborers. Doc. 218 at 8–9, ¶¶ 21–22; *id.* at 12–13, ¶¶ 33–36; Doc. 226 at 5. Whether that blanket classification was proper—and in particular, whether the Motor Carrier Act exemption applies to manual landscape laborers who spend most of their workday on non-safety-affecting tasks—is a question that generates a common answer for the entire class. *Cf. Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916–17 (10th Cir. 2018) (finding that a question of whether a policy was improper met Rule 23(a)'s commonality requirement because all class members based their claims on the same challenged policy).

Signature argues that "highly individualized facts and circumstances" preclude commonality, citing *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013). Doc. 224 at 27. But the variations Signature identifies are variations in the evidence individual class members may offer. They are not variations in the question the members' claims present. Every class member's claim turns on the same contention: whether Signature's blanket classification was lawful. That some employees spent more time loading trucks while others spent more time on road transit does not generate different legal questions, rather it generates different factual showings in answer to the same legal question. Commonality under Rule 23(a)(2) requires a question "capable of classwide resolution" whose "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims

19

in one stroke." *Dukes*, 564 U.S. at 350. The lawfulness of Signature's uniform classification is exactly that kind of question.

*Tabor* undermines Signature's argument because it did not involve a single classification. *Contra* Doc. 224 at 27. The Tenth Circuit found no common question existed because the employer's compensation practices varied by location and manager. *Tabor*, 703 F.3d at 1229. Unlike in *Tabor*, the plaintiffs have identified a single, across-the-board classification that applies to every member of the proposed class. That makes a difference. *See Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1193–94 (10th Cir. 2023) (explaining that the presence of some individualized inquiries does not defeat commonality once a common question is identified). The plaintiffs satisfy commonality.

**c**

The third inquiry is typicality. Rule 23(a)(3) requires that the claims of the representative plaintiffs be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). But "the interests and claims of named plaintiffs and class members need not be identical." *Devaughn*, 594 F.3d at 1198. So long as their claims are "based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." *Id.* at 1198–99.

Valdez establishes typicality. Like all putative class members, Valdez was classified as exempt under the same company-wide policy, spent the vast majority of his time on manual landscape labor, and was denied overtime. His claims arise from the same uniform exemption policy and rest on the same legal theory as every other class member's claims, thus satisfying typicality. *See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (finding claims typical where the plaintiff possessed the same interest and suffered the same injury as all putative class members); *Menocal*, 882 F.3d at 917 (explaining that individual factual circumstances did not defeat

typicality because the legal theory was the same regardless of differences among plaintiffs).[4]

Signature argues that there are extensive factual differences across departments, roles, and job duties, which preclude any landscape laborer from being "typical." Doc. 224 at 28. But typicality does not require identical claims, it requires that the representative's claims be "based on the same legal or remedial theory." *Devaughn*, 594 F.3d at 1198–99. Valdez's claims arise from the same blanket exemption classification applied to every class member and rest on the same legal theory. That his specific mix of duties might vary from other class members' does not defeat typicality where the legal theory is uniform. *See Menocal*, 882 F.3d at 917.

**d**

The fourth inquiry is adequacy. Rule 23(a)(4) requires that the representative plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The core inquiry asks whether the named plaintiffs and counsel have any conflicts of interest with other class members and will prosecute the action vigorously on behalf of the class. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1204 (10th Cir. 2006). Notably, "[o]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1185 n.6 (10th Cir. 2025) (citations omitted). A conflict that is "merely speculative or hypothetical" does not suffice to defeat adequacy. *Id.*

Valdez satisfies adequacy. He is a named plaintiff who has prosecuted this action since its inception. Doc. 1. The record reflects no unique defenses or antagonistic interests. As previously noted, he holds claims under both the FLSA and the Missouri Minimum Wage

---

[4] Signature contends that Valdez is not typical because, as a Kansas-based employee, he has no claim under Missouri overtime law and therefore is not a member of the class he seeks to represent. Doc. 224 at 28. This argument fails because, as set forth above, the Missouri Minimum Wage Law covers hours physically worked in Missouri regardless of the employee's state of residence or starting office.

Law, and his interests are aligned with those of the class. That suffices. *See Carpenter v. Boeing Co.*, 456 F.3d at 1204.[5]

Signature contends that Valdez's simultaneous role as FLSA collective representative creates a structural conflict of interest. The gist of the argument is a dual representative might discount Rule 23 class claims to benefit the FLSA collective in settlement. Doc. 224 at 28–29 (citing *Albelo v. Epic Landscape Prods., L.C.*, No. 4:17, 2021 WL 2651809, at *6 (W.D. Mo. June 28, 2021)). That argument fails for a couple of reasons.

For one thing, it is entirely speculative. A conflict of interest "must be manifest at the time of certification," and concerns about how a representative might negotiate a future settlement are properly raised as a fairness challenge, not an adequacy challenge, if and when a settlement is proposed. *Tennille v. W. Union Co.*, 785 F.3d 422, 431 (10th Cir. 2015). Moreover, there is no evidence suggesting that Valdez's interests as collective representative have diverged (or will likely diverge) from the class's interests. Speculation alone cannot defeat adequacy. *Cline*, 159 F.4th at 1185 n.6.

For another, *Albelo* is distinguishable. In that case, the proposed class representative had only FLSA claims, while the Rule 23 members also held unjust-enrichment and breach-of-contract claims that the representative could not adequately prosecute. *Albelo*, 2021 WL 2651809, at *6. That created concrete, identifiable diverging interests.

In this case, Valdez holds both FLSA and Missouri claims and belongs both to the collective and the class he seeks to represent. The *Albelo* conflict was not merely structural but claim-specific because the representative could not prosecute the class's state-law theories. *Id.* No such defect applies to Valdez.

\* \* \*

The plaintiffs satisfy the Rule 23(a) prerequisites. The proposed class is sufficiently numerous that joinder would be impracticable. The

---

[5] Signature argues Valdez cannot adequately represent the class because he is not a class member. Doc. 224 at 28. This fails for the same reason as the parallel typicality argument: Valdez is a class member under the Missouri Minimum Wage Law.

lawfulness of Signature's blanket Motor Carrier Act exemption presents a common question capable of classwide resolution. Valdez's claims are typical of the class because they arise from the same uniform policy and rest on the same legal theory. And Valdez has demonstrated that he will fairly and adequately represent the class's interests without conflict.

**3**

In addition to the Rule 23(a) prerequisites, the plaintiffs must also satisfy "the requirements of one of the types of classes in Rule 23(b)." *Devaughn*, 594 F.3d at 1194. The plaintiffs invoke Rule 23(b)(3). Doc. 218 at 29. That provision requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiffs satisfy both requirements.

**a**

Predominance is the first question that arises under Rule 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). In short, predominance requires first identifying each aspect of a claim and categorizing whether each aspect is individualized or common based on the inquiry and proof required, and then weighing the common questions against the individualized questions. *Id.*; *see also Wallace*, 725 F.3d at 1220. Where the injury is common to the class and stems from the same legal theory, common questions are more likely to predominate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This standard is "far more demanding" than Rule 23(a)(2)'s commonality requirement. *Id.* at 624.

As applied to the plaintiffs' claims, the record confirms that common questions predominate over individualized ones. Under the plaintiffs' theory, the proposed class must prove that Signature's blanket classification of all landscape laborers as exempt was unlawful. It is undisputed that all Missouri Minimum Wage Law class members worked more than 40 hours per week during relevant workweeks, that Signature did not pay overtime to any landscape laborer before July 4, 2021, and that the only defense asserted is the Motor Carrier Act

exemption. Doc. 218 at 31–32. Both questions—the lawfulness of the classification and the measure of damages—are common because they are susceptible to common legal proof that will settle those questions for the entire class at once. *See Amgen Inc.*, 568 U.S. at 469.

Signature is right that "common issues [do not] predominate merely because Signature classified members of the putative class as exempt." Doc. 224 at 31. But predominance here does not rest on the label alone. Signature's own H-2B applications, internal job postings, and KansasWorks.com postings describe identical job duties for all landscape laborers, and its corporate representative confirmed that "Landscape Laborer" and "Crew Member" are the same position. Doc. 226 at 5. Deposition testimony from 43 plaintiffs—27% of the collective—reflects that approximately 90% of the workday is spent on manual landscape labor rather than safety-affecting activities. Doc. 218 at 15–20. The validity of Signature's sole defense of exemption is therefore not just a question common to the class but the issue that predominates over all others. *See Menocal*, 882 F.3d at 925–26 (finding predominance where the plaintiffs' theory relied on facts shared amongst the class).

Signature identifies four categories of individualized inquiry it contends would dominate trial and thus frustrate predominance. These include truck inspection practices, loading time and materials, time on the road and transit duties, and safety training content. Doc. 224 at 37–43. These are the same categories Signature unsuccessfully raised in opposing FLSA collective certification, Doc. 25 at 16–18, and when requesting decertification. *See* Section II.B. It is true, the Rule 23(b)(3) predominance standard is more demanding than the *Thiessen* "similarly situated" standard, *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), but the factual predicate is the same, and the assessment does not materially change in this context. The variations Signature identifies are variations in the evidence relevant to a common question, not evidence that different class members face different questions.

Consider each category in turn. On truck inspections, whether pretrip inspections constitute safety-affecting work under the Motor Carrier Act is a common legal question, regardless of whether any given employee spent five minutes or fifteen minutes on them. On loading, the Motor Carrier Act "loader" exemption Signature cites under 29 C.F.R. § 782.5 turns on whether the employee exercised "judgment and discretion in planning and building a balances load," not on how many minutes loading consumed. *See Gomez v. Epic Landscape Prods.,*

24

*L.C.*, No. 22-2198, 2025 WL 1262463, at *10 (D. Kan. Apr. 30, 2025). Whether any landscape laborer exercised such judgment is a common question resolvable through common evidence, including Signature's own policies placing load-securing responsibility on drivers. As for road time and transit duties, the threshold legal question—whether riding in a vehicle as a convenient means of transportation satisfies the "required to ride" standard for the driver's helper exemption Signature cites under 29 C.F.R. § 782.4—is common. *See Gomez*, 2025 WL 1262463, at *9. And as for safety training, the relevance of safety training to the Motor Carrier Act exemption is itself a common question that does not vary by class member.

Signature argues that its own tabulation of deposition testimony shows that 44% of deponents acknowledged spending more than 10% of their time on duties Signature characterizes as safety-affecting. Doc. 224 at 36 n.10. This statistic improperly conflates the merits with the certification question. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc.*, 568 U.S. at 466. The fact that some employees may have spent more time on certain activities does not mean their claims raise different questions, rather it means the same common question may yield different answers for different members of the class. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately."); *see also Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1185 (10th Cir. 2023) ("The predominance inquiry at class certification asks to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor."). Moreover, whether particular activities qualify as "safety-affecting" under the Motor Carrier Act framework is itself a disputed common legal question. *See Gomez*, 2025 WL 1262463, at *7–8. The plaintiffs have sufficiently shown that on balance, their common issues predominate over ones that may require individual evidence. *Menocal*, 882 F.3d at 920–21. The plaintiffs satisfy predominance.

**b**

The next factor to consider is superiority. A plaintiff proceeding under Rule 23(b)(3) must show that a class action would be "superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) includes an illustrative list of considerations, including the class members' interests in controlling the prosecution of separate actions; the extent and nature of any litigation already begun by or against class members; the desirability of concentrating the litigation of the claims; and the likely difficulties in managing a class action. *Id.*; *see also Menocal*, 882 F.3d at 915. At heart, the superiority inquiry contrasts class treatment with alternative methods of resolution and asks whether alternative methods are preferable. *Black*, 69 F.4th at 1190. As set forth in more detail below, class treatment is superior because every factor favors certification.

Take the size of the individual claims first. The record establishes that individual claims average $3,553.76 in lost overtime. Doc. 218 at 34. This sum is far below what would justify individual litigation— making it "nearly impossible to obtain counsel who can work on a contingent basis." *Id.* As the Tenth Circuit has noted, that is a strong reason to believe a class action is a superior procedural vehicle. *Menocal*, 882 F.3d at 915 (citing *Amchem*, 521 U.S. at 617).

Consider also the structural issues facing the members of the class. Many class members speak no English, have limited understanding of Missouri law, and many have returned to their home countries. Doc. 218 at 35. The Tenth Circuit has recognized that the class action device is "especially pertinent to vulnerable populations" with limited understanding of the law and limited English skills. *Menocal*, 882 F.3d at 915–16.

Moreover, resolution on a class-wide basis would substantially advance judicial economy and prevent Signature from facing the possibility of inconsistent decisions. All putative plaintiffs have a common question as to liability. In addition, there is no other pending litigation against Signature involving these claims. Doc. 218 at 34. And the District of Kansas is the only appropriate forum given that Signature is a Kansas entity and the FLSA collective is already pending here.

Signature disputes superiority. It cites *Romulus v. CVS Pharmacy, Inc.*, 321 F.R.D. 464 (D. Mass. 2017), and *Lissys Cortes v. Honeywell Building Sols. SES Corp.*, No. 12-23377, 2014 WL 11958626 (S.D. Fla. Sept. 24, 2014), for the proposition that mini-trials would overwhelm efficiency gains. Doc. 224 at 43–44. Both are distinguishable. *Romulus* did not analyze superiority; it denied certification on commonality and predominance grounds. *Romulus*, 321 F.R.D. at 466–67. Those concerns are not present in this case. And *Lissys Cortes* involved service

technicians performing qualitatively different work across different building types and equipment, making it impossible to determine class-wide whether they were exempt. 2014 WL 11958626, at *9. Again, those concerns are not present here because the variation is in de-gree—class members performed the same manual landscape labor in differing proportions relative to safety-adjacent tasks—rather than in kind.

Signature also contends that the plaintiffs have proposed no work-able trial plan. Doc. 224 at 45–47. But no trial plan has been ordered, and Rule 23 does not require one as a precondition to certification. *See* Fed. R. Civ. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (describing certification orders as "inherently tentative" and confirming courts "remains free to modify" them "in the light of sub-sequent developments in the litigation").

\* \* \*

The plaintiffs have shown that a class-action approach would be preferable to other approaches for fairly and efficiently resolving the issues here, thus satisfying their burden. Fed. R. Civ. P. 23(b)(3). Sig-nature's arguments to the contrary fail. Thus superiority is satisfied.

**4**

The next inquiry concerns adequacy of counsel. Rule 23(g) requires courts to appoint class counsel who will "fairly and adequately repre-sent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (g)(4). The appointment is a sensitive matter; Rule 23(g) "carefully regulates" it because "the selection and activity of class counsel are often critically important to the successful handling of a class action." Fed. R. Civ. P. 23(g) advisory committee's note (2003 amendments); *Martin v. Blessing*, 571 U.S. 1040, 1042 (2013) (Alito, J., statement respecting the denial of certiorari).

Rule 23(g)(1)(A) directs courts to consider four factors. These in-clude the work counsel has done identifying or investigating potential claims, counsel's experience in handling class actions, complex litiga-tion, and the types of claims asserted, counsel's knowledge of the ap-plicable law, and the resources counsel will commit to representing the class. Courts may also consider "any other matter pertinent to coun-sel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); 1 William B. Rubenstein, Newberg &

Rubenstein on Class Actions §§ 3:80–81 (6th ed. 2022). The duty Rule 23(g)(4) places on class counsel continues through final judgment. *In re Samsung Top-Load Washing Mach. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 997 F.3d 1077, 1088 (10th Cir. 2021) (citing *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261–62 (2d Cir. 2021)).

Proposed class counsel satisfy all four factors. On investigative work, counsel conducted 42 landscape laborer depositions, two Rule 30(b)(6) depositions, depositions of Signature's two Presidents, written discovery, and retained an expert witness. Doc. 226 at 15. On experience, Mr. Donelon has litigated wage-and-hour matters for three decades, has been designated lead class counsel in over 100 cases, and his firm has recovered in excess of $110 million in class and collective actions—including a multidistrict litigation on behalf of over 180,000 employees in this District and a class action tried to jury verdict. Doc. 218-52 at 1–3. Ms. Atwell-Soler brings trial experience in employment matters, a federal clerkship, and is a certified Spanish-English court interpreter—a qualification of particular relevance in a case where the class is substantially composed of Spanish-speaking workers with limited English proficiency. Doc. 218-54 at 1–2. On knowledge of the applicable law, counsel's briefing on the Motor Carrier Act exemption standard, the Missouri Minimum Wage Law territorial scope question, and the written-consent issue demonstrates thorough command of the legal framework. On resources, the scope of discovery already conducted reflects a significant investment, and nothing in the record suggests that counsel lacks the resources to continue through trial.

Signature's objections do not change things. Signature first cites *London v. Wal-Mart*, 340 F.3d 1246, 1253 (11th Cir. 2003), for the general proposition that Rule 23(a)(4) encompasses adequacy of both the representative and counsel. Doc. 224 at 29. Aside from citing *London*, Signature builds no argument that actually tracks *London*'s holding, which turned on a close personal friendship and financial relationship between the class representative and class counsel that gave the representative an incentive to maximize counsel's fees at the class's expense. *See* 340 F.3d at 1253–55. Signature alleges nothing of the sort here.

Signature then cites *Lawrence v. Goals Aesthetics & Plastic Surgery*, No. 18-8649, 2024 WL 3742398 (S.D.N.Y. Aug. 9, 2024) for the proposition that discovery failures can support decertification on adequacy grounds. *See* Doc. 224 at 29. But *Lawrence* involved genuinely egregious conduct: six years of litigation during which counsel never requested class-wide payroll records, drew Rule 26 sanctions, lost class damages

to Rule 37 preclusion, and admitted on the eve of trial to an inability to identify the class members and calculate their damages. *See* 2024 WL 3742398, at *1, *5–6, *8, *11–13. Again, Signature alleges nothing of the sort here.

Finally, Signature's remaining criticism—that counsel relied on *Gomez*, 2024 WL 4605146, rather than developing an independent evidentiary record, *see* Doc. 224 at 29–30—is not tethered to any Rule 23(g) factor. Signature cites no authority for the proposition that reliance on persuasive precedent from a materially similar case renders counsel inadequate.

The record amply demonstrates that proposed class counsel are adequate under Rule 23(g). Brendan Donelon (Donelon, P.C.) and Ashley Atwell-Soler (Holman Schiavone LLC) are appointed as class counsel. Counsel's obligations under Rule 23(g)(4) are ongoing, and adequate class representation requires continued attention to class-specific evidentiary needs as the case progresses toward trial. *See Samsung*, 997 F.3d at 1088 ("A district court is required to monitor class proceedings and 'reassess its class rulings as the case develops.'").

### D

The inquiry now turns to the parties' cross-motions for summary judgment. The plaintiffs move for partial summary judgment on a quasi-estoppel theory, arguing that Signature's H-2B representations preclude Signature from asserting the Motor Carrier Act exemption. Doc. 227. Signature moves for summary judgment on all the named plaintiffs' claims, contending that the Motor Carrier Act exemption applies to both Valdez and Gomez as a matter of law. Doc. 229.

As with cross-motions generally, the following analysis evaluates each motion independently, viewing the facts in the light most favorable to the nonmovant on each. *See Rio Grande Found. v. Oliver*, 154 F.4th 1213, 1220-21 (10th Cir. 2025). The analysis addresses the quasi-estoppel theory first, then resolves the threshold legal question governing the Motor Carrier Act exemption standard, and finally applies that standard to the named plaintiffs.

### 1

The plaintiffs move for partial summary judgment by invoking the Kansas doctrine of quasi-estoppel. Specifically, the plaintiffs seek to

preclude Signature from arguing that it applied the Motor Carrier Act exemption based on representations it made to the Department of Labor in its H-2B applications. Docs. 227, 228. As the moving party, the plaintiffs bear the burden of demonstrating that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). They have not carried that burden.

Under Kansas law, quasi-estoppel is a doctrine that precludes a party from asserting a position so inconsistent with a prior position that allowing it would be unconscionable.[6] *Wichita Fed. Sav. & Loan Ass'n v. Black*, 781 P.2d 707, 716 (Kan. 1989). Unlike equitable estoppel, quasi-estoppel does not require proof of a false representation or detrimental reliance. *Chelf v. State*, 263 P.3d 852, 862 (Kan. Ct. App. 2011). Where the positions are not genuinely inconsistent, or where the inconsistency does not rise to the level of unconscionability, the doctrine does not apply. *Ribeau v. Candies*, 333 P.3d 921, 929 (Kan. Ct. App. 2014); *Wichita Fed.*, 781 P.2d at 718. Kansas courts treat the inconsistency and unconscionability determinations as fact-intensive inquiries. In *Chelf*, *Ribeau*, and *Wichita Federal*, for example, the courts declined to apply any bright-line rule and instead examined the specific circumstances surrounding the alleged inconsistency—including what the prior conduct actually signified in context, whether the positions were genuinely inconsistent, and whether the party invoking estoppel contributed to the alleged inconsistency. *See Chelf*, 263 P.3d at 862; *Ribeau*, 333 P.3d at 929; *Wichita Fed.*, 781 P.2d at 718.

The plaintiffs contend that quasi-estoppel prohibits Signature from asserting the Motor Carrier Act exemption as a defense. Doc. 228 at 1. The plaintiffs argue that Signature took a position in its H-2B applications—namely, that all landscape laborers would be paid overtime—

---

[6] The parties assume and purport to apply the forum state law (Kansas) to the quasi-estoppel analysis. Doc. 228 at 14–15; Doc. 232 at 14; *see also* Doc. 222 at 12 n.3. As a result, this Memorandum and Order does the same. *Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 812 (10th Cir. 2014) (applying Nevada law because "[t]he parties assume[d] that Nevada law applies"); *see also In re MTE Holdings LLC*, 136 F.4th 506, 515 n.9 (3d Cir. 2025) ("Where, as here, the parties do not make an issue of choice of law, we have no obligation to make an independent determination of what rule would apply if they had made an issue of the matter") (cleaned up)). Even so, the relevant considerations and outcome under Missouri law appear to be the same. *See, e.g., White v. Wilks*, 391 S.W.2d 260, 262 (Mo. 1965).

that is irreconcilably inconsistent with its assertion in this litigation that these same employees are exempt from overtime under the Motor Carrier Act. Doc. 228 at 14. The plaintiffs contend that Signature benefited from this representation by obtaining DOL approval to hire H-2B workers year after year. *Id.* at 20. The plaintiffs further maintain that Signature's conduct mirrors that of the defendant in *Kutty v. U.S. Dep't of Labor*, No. 3:05-510, 2011 WL 3664476 (E.D. Tenn. Aug. 19, 2011), where a party was estopped from challenging the validity of DOL forms he had completed and reaped the benefit of those representations. Doc. 228 at 18–20. The plaintiffs contend that no genuine dispute of material fact exists and that partial summary judgment barring Signature's Motor Carrier Act exemption defense is appropriate. Doc. 228 at 14. [7]

The plaintiffs have identified an inconsistency. That alone does not establish quasi-estoppel—it also requires that permitting the inconsistency would be unconscionable. *Ribeau*, 333 P.3d at 929. So the inquiry here turns on unconscionability.

Kansas law has not outlined fixed criteria for determining unconscionability in the quasi-estoppel context, but it treats the term as a unitary equitable concept that operates across doctrinal boundaries. *See, e.g.*, *Wille v. Southwestern Bell Tel. Co.*, 549 P.2d 903, 906 (Kan. 1976); *Kansas Baptist Convention v. Mesa Operating Ltd. P'ship*, 864 P.2d 204, 217–18 (Kan. 1993). The cases highlight a few relevant considerations for the analysis. First, voluntariness and knowledge on the part of the party taking inconsistent positions go to unconscionability. *See e.g.*, *Bowen v. Lewis*, 426 P.2d 244, 250 (Kan. 1967) (noting that the doctrine "deals with conscience on the part of those who know the facts and do not speak"); *Via Christi Reg'l Med. Ctr. v. Reed*, 314 P.3d 852, 867 (Kan. 2013) (finding unconscionability where a party knows the truth and chooses to misrepresent it). Second, the creation of unjust advantages

---

[7] Whether quasi-estoppel can override a substantive FLSA exemption is an open question that the parties do not address. Equity may supplement statutory schemes, *see Holland v. Florida*, 560 U.S. 631 (2010), but courts have recognized meaningful limits on using equitable doctrines to displace substantive statutory provisions, see *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014). Neither party has identified a single case permitting quasi-estoppel to bar an FLSA exemption defense. As a result, this analysis assumes without deciding that the doctrine could apply. Even so, the plaintiffs fail to establish its elements.

or disadvantages through inconsistent positions also contributes to the finding of unconscionability. *See, e.g., Steckline Commc'ns, Inc. v. Journal Broad. Grp.*, 388 P.3d 84, 92 (Kan. 2017) (noting "it would be unconscionable to allow a person to maintain a position inconsistent with one in which he or she accepted a benefit"); *Hill v. Hill*, 345 P.2d 1015, 1023 (Kan. 1959) (using "unconscionable advantage" as the operative concept). Third, the scale and nature of the inconsistency go to the unconscionability determination. *See, e.g., Kirk v. Beachner Constr. Co.*, 522 P.2d 176, 179 (Kan. 1974) (noting that "[w]hat is shocking to the conscience depends upon the amount . . . as related to the facts and circumstances of a given case"); *Adams v. John Deere Co.*, 774 P.2d 355, 357 (Kan. Ct. App. 1989) (noting conduct in question must be "so outrageous and unfair [ ] that it shocks the conscience").[8]

The plaintiffs have not shown entitlement to judgment as a matter of law because there are several genuine disputes of material fact that preclude a determination of unconscionability. First, the voluntariness question presents a genuine dispute. Signature's founder and former CEO admitted he knew overtime would not be paid when he signed the applications, Doc. 228 at 11, and a 2017 attorney letter had flagged the inconsistency years earlier, Doc. 228 at 8–9, which suggests knowing misrepresentation. But Signature presents testimony from multiple officers that the DOL's online portal did not permit a different option.

---

[8] While not binding, it is persuasive that several other jurisdictions have found these to be necessary elements of unconscionability in the context of quasi-estoppel doctrine. The Alaska Supreme Court, for example, identified the following five unconscionability indicators: The gain of an advantage through the inconsistent position, the magnitude of the inconsistency, the contribution of changed circumstances to the inconsistency, the reliance of the party claiming estoppel on the inconsistency, and the knowledge of party taking the inconsistent position. *Jamison v. Consol. Utilities, Inc.*, 576 P.2d 97, 102–03 (Alaska 1978). Several other jurisdictions have adopted the same unconscionability factors in the context of quasi estoppel. *See, e.g., Iberlin v. TCI Cablevision of Wyo., Inc.*, 855 P.2d 716, 728 (Wyo. 1993); *Willard v. Ward*, 875 P.2d 441, 444 (Okla. Ct. App. 1994); *Kroger Specialty Pharmacy FL 2, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 3:23-CV-001217, 2024 WL 1774000, at *8 (M.D. Tenn. Apr. 24, 2024), *aff'd sub nom. Kroger Specialty Pharmacy LA, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 24-5513, 2024 WL 5003233 (6th Cir. Dec. 6, 2024). And in jurisdictions where these are not explicit elements of an unconscionability determination, they are often elements of the quasi-estoppel test itself. *See, e.g., Hensgen v. Silberman*, 197 P.2d 356, 359 (Cal. Dist. Ct. App. 1948); *Wagenschein v. Ehlinger*, 581 S.W.3d 851, 856 (Tex. Ct. App. 2019).

Doc. 232 at 2, 9. The plaintiffs counter that the written form instructions allowed for blank fields so Signature could have simply left the overtime field blank rather than make a potential misrepresentation. Doc. 228 at 4–5. But that provides competing evidence for a jury to weigh, not a resolution to the dispute.

Second, significant disputes exist on the question of unjust advantage. Gordon's testimony, that leaving the overtime field incomplete would get Signature "kicked to the back of [the DOL] line" and delay its ability to hire workers, could support the inference that the representations were instrumentally connected to obtaining approval. Doc. 228 at 12 (quoting Doc. 228-2 at 95:19–96:10). But Signature presents evidence that the DOL audited its Motor Carrier Act exemption practices in 2021 and found no violation, Doc. 232 at 9–10 (citing Doc. 220-48 at No. 3; Doc. 230-11 at 54:4–55:20), and continued approving H-2B applications after Signature expressly disclosed the exemption in 2023, Doc. 232 at 8 (citing Doc. 232-3 at ¶ 10); Doc. 232 at 10 (citing Doc. 232-3 at ¶ 11). If the DOL would have approved the applications regardless, the link between the representations and any benefit is tenuous. The plaintiffs, of course, dispute the scope of the 2021 audit. Doc. 235 at 8 (citing Doc. 231-2 at 135:2–136:8). Resolution of that dispute is for a jury.

Third, the scale of the inconsistency depends on the same disputed facts. If Signature had alternatives and chose to misrepresent—repeatedly, under penalty of perjury, after counsel flagged the problem (Doc. 228 at 8–9)—the inconsistency may be severe. But if the system genuinely compelled the entries (Doc. 224-3 at ¶ 5), the inconsistency is substantially diminished. Viewing the disputed facts in Signature's favor, it is not possible to make the proper determination about the inconsistency's magnitude. A jury will be required to resolve that dispute.

Additionally, the relevant laborers here did not rely on Signature's representation. Signature directed the relevant representations to the DOL. They did not direct those representations to the named plaintiffs, who were never H-2B workers—they never saw the applications and were told at hiring they would not receive overtime. Doc. 224-5 at 96:6–20; Doc. 224-4 at 12:11–17; Doc. 224-5 at 51:17–19; Doc. 224-4 at 35:20–24. In many jurisdictions with a quasi-estoppel doctrine, these facts alone would preclude application of the doctrine. *See, e.g.*, *Smith v. DenRoss Contracting, U.S., Inc.*, 737 S.E.2d 392, 398 (N.C. Ct. App. 2012)("[Q]uasi-estoppel requires mutuality of parties; the doctrine may not be asserted by or against a 'stranger' to the transaction that gave

33

rise to the estoppel."); *Wagenschein v. Ehlinger*, 581 S.W.3d 851, 857 (Tex. Ct. App. 2019) (same); *Bailey v. Duling*, 827 N.W.2d 351, 362 (S.D. 2013) (same). And, notably, Signature took a consistent position with its own employees throughout. Doc. 232 at 6, 8. Whether any improper benefit Signature derived from its government-facing representations renders its defense in this litigation unconscionable is a different question than whether the representations themselves were false, and, when viewing the facts most favorably to Signature, it is a question the record does not conclusively answer.

In short, summary judgment is not available for the plaintiff's quasi-estoppel argument. Signature's H-2B certifications—directed at the DOL, not the plaintiffs, and made in a context where the DOL audited and approved Signature's Motor Carrier Act exemption practices—do not establish conscience-shocking conduct as a matter of law. "Generally, whether estoppel is appropriate in a given situation raises a question of fact . . . [a]nd disputed questions of fact typically make summary judgment—as granted in the instant case—inappropriate." *Becker v. The Bar Plan Mut. Ins. Co.*, 429 P.3d 212, 219 (Kan. 2018). Thus, the plaintiffs' motion for partial summary judgment, Doc. 227, is denied.

**2**

Signature seeks summary judgment on the applicability of its asserted Motor Carrier Act exemption. Doc. 229. Signature contends that the Motor Carrier Act exemption applies to the named plaintiffs as a matter of law, which would preclude their FLSA overtime claims. *See generally* Docs. 230, 236. Under this exemption, the FLSA's overtime provisions do not apply to any employee over whom the Secretary of Transportation has power to establish qualifications and maximum hours of service. 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502(b). Signature bears the burden of proving the exemption applies. *EMD Sales, Inc. v. Carrera*, 604 U.S. 45, 48 (2025). To do so, it must show that it is a motor carrier subject to the Secretary's jurisdiction and that each plaintiff's activities directly affect the safety of operation of motor vehicles in interstate commerce. *Deherrera v. Decker Truck Line*, Inc., 820 F.3d 1147, 1154 (10th Cir. 2016); *see also Williams v. Central Transp. Int'l, Inc.*, 830 F.3d 773, 775 (8th Cir. 2016).

Neither Signature's status as a motor carrier nor the interstate commerce element is in dispute. *See* Doc. 231 at 3, ¶¶ 1, 6 (indicating Signature's motor carrier status is uncontroverted); Doc. 231 at 5, ¶¶ 24,

31 (conceding interstate travel); Doc. 236 at 5–6 (same). The only disputed element is whether the plaintiffs' activities directly affected the safety of operation of motor vehicles under the Motor Carrier Act.

The inquiry into whether activities directly affect safety of operation asks whether those activities fall into classifications of exempted work. The classifications include drivers, helpers, loaders, and mechanics. *Williams*, 830 F.3d at 775; Pub. L. No. 110-244, § 306(c)(2)(A), 122 Stat. 1572 (2008); *see also Kelley v. Alpine Site Servs., Inc.*, 110 F.4th 812, 815 (5th Cir. 2024). "[W]hether a particular employee falls within an exempt class . . . 'is to be determined by judicial process.'" *Williams*, 830 F.3d at 776 (quoting *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707 (1947)). Such a determination does not depend on one's job title, *Pyramid,* 330 U.S. 695 at 707–08, but rather on whether one dedicates a "substantial part of his time to" the relevant safety-affecting activity. *Williams*, 830 F.3d at 776. A majority is not required; the exemption applies even where "the smaller fraction of the employee's time or activities that is devoted to safety work." *Levinson*, 330 U.S. at 674. But activity that is "so trivial, casual or occasional a part of an employee's activities" does not bring any employee within the exemption. *Pyramid,* 330 U.S. at 708.

With the standard developed, the analysis now turns to the merits of Signature's motion for summary judgment. Doc. 229. That raises four discrete issues that are discussed in turn.

**a**

The first issue is whether Valdez falls within an exempt classification under the Motor Carrier Act exemption. Signature classifies him as a driver. Doc. 230 at 23. It is undisputed that Valdez drove Signature's commercial motor vehicles daily. Doc. 231 at 3–4, ¶ 9. But he estimates he spent approximately 15 to 30 minutes per day operating the vehicle or roughly 3% of a typical 11-hour workday. *Id.* at 3–4, ¶¶ 9, 13. He testified that trips of 1.5 to 2 hours are "very rare" and may occur only about once per year. *Id.* at 5, ¶ 21. Each morning, he loaded his truck with construction equipment and materials and confirmed load security before departure. Doc. 230 at 5–7, ¶¶ 16–23. He maintained a DOT medical card, completed daily Driver's Vehicle Inspection Reports, and held road test and motor vehicle record certifications. *Id.* The plaintiffs contend the remaining approximately 93% of his workday was spent on manual landscape labor. Doc. 231 at 3–4, ¶¶ 9, 13. Signature offers no competing percentage for Valdez.

Signature bears the burden of proving the exemption applies. *EMD Sales*, 604 U.S. at 48. On this record, it has not done so. Evidence suggests Valdez spends approximately 3% of his workday driving. Doc. 231 at 3–4, ¶ 9. Morning loading takes 15 to 20 minutes. *Id.* at 4–5 ¶¶ 17–23. The time consumed by load-security checks and vehicle inspection reports is not quantified. Whether all these activities, taken together, constitute a "substantial part" of Valdez's work, presents a genuine dispute of material fact. If those activities are brief and perfunctory, the total may remain in the range a reasonable factfinder could characterize as trivial relative to an 11-hour workday dominated by manual landscaping.

The *Gomez* court identified the same evidentiary gap as the basis for denying summary judgment on the driver exemption in a virtually identical case. *See Gomez v. Epic Landscape Prods., L.C.*, No. 22-2198, 2025 WL 1262463, at *7–9 (D. Kan. Apr. 30, 2025). The analysis there is persuasive. A reasonable jury could find, based on Valdez's daily driving, daily logs, and daily loading, that the exemption applies. A reasonable jury could also find that 15 to 30 minutes of driving in an 11-hour day, combined with routine and perfunctory ancillary tasks, is precisely the kind of incidental activity that falls below the substantiality threshold. Both parties will need to present evidence at trial on the total time Valdez devotes to all safety-affecting activities, not merely driving time alone.

Signature's arguments to the contrary do not change this result. Signature, for example, argues that once an employee is shown to drive a commercial vehicle in interstate commerce, no further inquiry into the "substantial part" question is necessary. *See generally* Docs. 230, 236. But no binding authority requires such an application of the exemption. True, *Levinson* says "the character of the activities rather than the proportion of either the employee's time or of his activities [ ] determines the [exemption question]." Doc. 236 at 6–7 (quoting *Levinson*, 330 U.S. at 674–75). But in context, this statement addresses whether the safety-affecting fraction must exceed 50%, not whether any floor exists. And it is also true that a footnote in *Levinson* uses "partial-duty loader" rather than "part-time loader" to "avoid the implication that time spent in certain activities, rather than the character of those activities, is to be the conclusive factor." *Levinson*, 330 U.S. at 652 n.3; Doc. 230 at 25. But "conclusive" is not "irrelevant." And *Pyramid*, 330 U.S. at 708, reinforced the point that a floor must exist when it held that placing freight on a truck "may form so trivial, casual or occasional a

part of an employee's activities" that the employee falls outside the exemption. The Court reserved decision on whether the exemption applies when "some, but less than a substantial part" of a loader's activities affect safety. *Id.* at 708–09. If time were irrelevant, there would be nothing to reserve after *Levinson*.[9]

Signature further argues Valdez is exempt as a "partial-duty driver" under the DOL's definition in 29 C.F.R. § 782.3. Doc. 230 at 25. But this definition deserves no deference. This very set of regulations concedes that the FLSA "confers no authority on the Secretary of Labor or the Administrator to extend or restrict the scope of [the Motor Carrier Act] exemption." 29 C.F.R. § 782.1(a). The Supreme Court has held as much. *Levinson*, 330 U.S. at 676–77. Multiple courts of appeals have likewise acknowledged the DOL's lack of authority on the issue and given its definitions "no weight or deference." *Williams*, 830 F.3d at 778; *accord Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 251 n.5, 252–53 (3d Cir. 2005); *Troutt v. Stavola Bros.*, 107 F.3d 1104, 1109 n.1 (4th Cir. 1997).

But even accepting the DOL's definition, Signature's argument fails. The regulation's examples of partial-duty drivers—relief drivers who help with loading, "driver-salesmen who devote much of their time to selling goods," and "drivers of chartered buses or of farm trucks who have many duties unrelated to driving"—all involve employees whose work is fundamentally bound up with transportation. 29 C.F.R. § 782.3(a). The regulation itself cautions that "an employee of a carrier who drives a motor vehicle" is not "exempted as a 'driver' by virtue of that fact alone," and cites *Colbeck v. Dairyland Creamery Co.*, 17 N.W.2d 262 (S.D. 1945), in which a refrigeration mechanic who drove a truck solely to transport himself to job sites was held not

---

[9] Signature relatedly cites *United States v. Dixie Grain Co.*, 246 F. Supp. 705, 712 (E.D. Tenn. 1965), for the proposition that "a person who spends ten minutes a day or an hour a week in driving or in mechanically repairing trucks, and the remaining 39 hours of a 40-hour week in work having no effect upon safety falls within the [exemption]." Doc. 236 at 9. But the proposition Signature draws from *Dixie Grain* originates from the dissent in *Levinson*, not the majority opinion. 330 U.S. at 688–89 (Rutledge, J., dissenting). The majority held that a "substantial part" of the employee's activities must consist of classified work. *Id.* at 681, 685. And the interpretations of dissenting opinions, by definition, do not create binding precedent. *United States v. Jackson*, 240 F.3d 1245, 1249 (10th Cir. 2001) (*overruled on other grounds by United States v. Prentiss*, 256 F.3d 971, 981 (10th Cir. 2001) (en banc)).

exempt. 29 C.F.R. § 782.3(b). Valdez's situation more closely resembles *Colbeck* than any of the regulation's examples of partial duty drivers. *See Gomez*, 2025 WL 1262463, at *9 (reviewing similarly situated workers and declining to "find as a matter of law that Defendants are entitled to apply the MCA exemption to those Plaintiffs who drove trucks, even on a daily basis, in connection with their work as foremen-laborers").

Signature contends that Valdez need not spend any particular amount of time driving because the exemption attaches so long as he "could be called upon" to drive. Doc. 236 at 9–10. But that standard, as developed in the case law, addresses a different element of the exemption. *Starrett v. Bruce*, 391 F.2d 320, 323 (10th Cir. 1968), which Signature cites repeatedly, asks whether DOT jurisdiction attaches to a driver who has not personally crossed state lines but could reasonably be expected to do so. That concerns an interstate commerce question, not a safety-affecting duties question. The DOT's own interpretation confirms as much, specifying that "[t]his interpretation relates solely to the jurisdiction over drivers" who are or could be "called on . . . to drive in interstate commerce." 46 Fed. Reg. 37,902, 37,903 (July 23, 1981). The only authority extending this standard to the safety-affecting duties element is 29 C.F.R. § 782.2(b)(3), which, as discussed, deserves no deference.[10]

---

[10] Even if Section 782.2(b)(3) were entitled to deference, it does not follow that Signature's interpretation is correct. The regulation's "could be called upon" language refers to performing "safety-affecting activities of the character described in paragraph (b)(2)," which defines those activities as work that is both classified as driver, helper, loader, or mechanic work and directly affecting safety in interstate commerce. The cross-reference bakes in the interstate commerce component. And the relaxed "likely to be called upon" formulation applies by its terms only to "a member of a group of drivers, driver's helpers, loaders, or mechanics" which assumes the employee is already classified within an exempt category and then asking whether that employee is likely to perform the relevant work in interstate commerce. Section 782.2(b)(3). The regulation's own illustration confirms this: The *Morris v. McComb* example in Section 782.2(c)(1) involves employees already established as "drivers," with the only question being whether they could be called upon to drive interstate. Signature inverts this structure, using a standard designed to address the interstate commerce element to resolve the antecedent classification question reserved for "judicial process." *Pyramid*, 330 U.S. at 707.

Signature's remaining support—*Rosales v. Industrial Sales & Services, L.L.C.*, 2025 WL 1079075, at *3 (5th Cir. 2025), and *Kelley v. Alpine Site Services, Inc.*, 110 F.4th 812, 816 (5th Cir. 2024)—are inapposite. Those cases applied the standard to safety-affecting duties but did so by relying on Section 782, which, as previously noted, deserves no deference. And both cases suggest that the quantum of safety-affecting activity required likely sits beyond Valdez's estimated 3%. *See Kelley*, 110 F.4th at 815–16 (concluding that the "substantial part" standard was met where loading constituted up to 40% of the employees' work); *see also Rosales*, 2025 WL 1079075, at *3 (concluding the same based on "comparable degrees of relevant work").

Notwithstanding Signature's arguments, a genuine dispute as to material facts exists. Thus, summary judgment on the Motor Carrier Act exemption as applied to Valdez is denied.

**b**

The second issue for summary judgment is Gomez's FLSA collective-action claims. Signature raises two key arguments for denying such claims, which the analysis considers in turn.

**i**

Signature moves for summary judgment on Gomez's FLSA collective-action claims, arguing that Gomez never filed the "written consent" required by 29 U.S.C. §§ 216(b) and 256. Doc. 230 at 29–30. Gomez was added as a named plaintiff through the Amended Complaint filed August 19, 2022. Doc. 9. Gomez never filed a separate consent-to-join form. Doc. 230 at 4, 30. But the Amended Complaint is not silent on consent. Paragraph 28 states: "By the filing of this Complaint, the Plaintiffs hereby consent in writing to be a part of this action pursuant to 29 U.S.C. § 216(b)." Doc. 9, ¶ 28. The question is whether that language satisfies Sections 216(b) and 256. It does.

Section 216(b) provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." In other words, the statute imposes two requirements: consent in writing, and filing in court. Section 256 then determines when the collective action is "commenced" for limitations purposes. Under Section 256(a), the action is commenced on the complaint date if the plaintiff "is specifically named as a party plaintiff in the complaint

and his written consent to become a party plaintiff is filed on such date." If "such written consent was not so filed," commencement occurs on the later date the consent is filed. *Id.* § 256(b).

The federal circuits are divided on whether a named plaintiff must file written consent separate from the complaint. Several circuits have held that a named plaintiff must file written consent to commence a collective action under Section 256 and that the complaint alone does not satisfy the requirement. *See Stone v. Troy Constr., LLC*, 935 F.3d 141, 152–55 (3d Cir. 2019*); Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012); *Harkins v. Riverboat Servs., Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004); *Acosta v. Tyson Foods, Inc.*, 800 F.3d 468, 472 (8th Cir. 2015); *Gomez v. Tyson Foods, Inc.*, 799 F.3d 1192, 1194 (8th Cir. 2015). Other circuits have reached a different conclusion, holding or implying that named plaintiffs need not file written consent separate from the complaint. *See Simmons v. United Mortg. & Loan Inv.*, *LLC*, 634 F.3d 754, 758 (4th Cir. 2011); *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916–17 (5th Cir. 2008); *Mickles v. Country Club Inc.*, 887 F.3d 1270, 1276 (11th Cir. 2018) (holding that a named plaintiff need only "file [a complaint] on behalf of herself and 'other similarly situated employees;" to become a proper plaintiff). The Seventh Circuit has acknowledged its own precedent is internally inconsistent on the question, calling it "complex" and "far too unsettled" to resolve without full briefing. *Smith v. Prof'l Transp., Inc.*, 5 F.4th 700, 704–05 (7th Cir. 2021). The Tenth Circuit has not addressed the issue.

Neither position needs to be adopted in full. Written consent is a requirement distinct from the complaint because the statute says so, and the weight of authority confirms it. But the statute does not mandate that written consent appear *in a separate filing* when it is expressly given within the complaint itself. That distinction resolves Gomez's claims.

The starting point is the text of Section 256(a). It identifies two conjunctive conditions for commencement on the complaint date: The plaintiff must be "specifically named as a party plaintiff in the complaint" *and* "his written consent to become a party plaintiff" must be "filed on such date." If the mere act of filing a complaint inherently constituted consent, the consent clause would add nothing, indeed, every named plaintiff would automatically satisfy it by filing suit. *Lambro v. United States*, 175 Fed. Cl. 536, 544 (U.S. Ct. Fed. Claims 2025) ("Presumably, every complaint implicitly manifests a litigant's consent to become a plaintiff, or else that litigant would not have filed a

complaint in the first place. That Congress chose to specify both 'the complaint' and 'his written consent' indicates that they are two separate requirements."). A named plaintiff who files a collective-action complaint without expressing consent has not satisfied Section 216(b), regardless of how the complaint is captioned or styled.

But the courts adopting this requirement appear not to have addressed whether express consent language contained within the complaint that has been filed can satisfy Sections 216(b) and 256. Rather, the arguments rejected in those cases were based on the notion of implicit consent. *See Harkins*, 385 F.3d at 1101 (rejecting argument that consent could be "presumed" from participation in discovery); *Acosta*, 800 F.3d at 472; *Gomez*, 799 F.3d at 1194 (seeking to recharacterize complaints as individual actions not subject to the consent requirement); *Stone*, 935 F.3d at 155 (finding affidavit insufficient where it did not identify plaintiff as a party or refer to the litigation); *Frye*, 495 F. App'x at 675 (never filing any consent); *Lambro*, 175 Fed. Cl. at 544 (rejecting argument that filing a complaint implicitly manifests consent). They do not foreclose the possibility that a complaint containing express written consent invoking Section 216(b) can do so.

Paragraph 28 of the Complaint at issue is not implicit consent. It is an express, written statement that "the Plaintiffs hereby consent in writing to be a part of this action pursuant to 29 U.S.C. § 216(b)." Doc. 9, ¶ 28. It uses the word "consent." It invokes the statute by citation. It was filed in court on the date Gomez was named as a party plaintiff. It performs the act that Section 216(b) requires—giving consent in writing—and it does so in a document filed in the court in which the action was brought. This is not the implicit consent that every plaintiff provides by the act of filing suit, which cannot independently satisfy Section 216(b) without rendering the consent clause superfluous. *Lambro,* 175 Fed. Cl. at 544. It is express consent in a pleading filed with the court.

The statutes require that written consent be given and filed. They do not prescribe a particular form. *See Contrera v. Langer*, 290 F. Supp. 3d 269, 278–79 (S.D.N.Y. 2018) (noting, after collecting cases, that "none of the cited cases require that a written consent to join an FLSA collective action take any specific form, other than being written and filed with the court"). Section 216(b) requires only that the employee "gives his consent in writing" and that "such written consent is filed in the court." Section 256(a) requires that "his written consent to become a party plaintiff is filed on such date." Neither provision uses the word

41

"separate." The question is whether the act of consent occurred, not whether it occupies its own docket entry.

Unlike the implicit consent interpretation that many courts have faced, construing a pleading filed in court with an express consent provision does not render Section 256(a)'s consent clause superfluous. *Cf. Lambro*, 175 Fed. Cl. 544–45. The clause retains independent meaning because not every complaint contains express consent language. For complaints that simply name the plaintiff without any affirmative consent, Section 256(b) provides that commencement occurs on the later date when written consent is separately filed. Paragraph 28 presents a different situation: A complaint that both names the plaintiff and independently satisfies the consent requirement through specific language drafted to that end. Both of Section 256(a)'s conjunctive requirements—naming and consent—are met on the filing date, and the action is commenced on that date. Both requirements just happen to be satisfied in one filing.

This application also avoids the concern that a plaintiff "might have been named without [her] consent." *Harkins*, 385 F.3d at 1101. In this case, Gomez retained counsel, who filed a complaint on her behalf expressly stating her consent under Section 216(b). Gomez was then deposed and participated in discovery for three years. There is no question that Gomez affirmatively chose to participate in this action.

Thus, Gomez's FLSA collective-action claims commenced on the date the Amended Complaint was filed—August 19, 2022. Doc. 9. Because Gomez stopped working for Signature in June 2022, claims accruing after August 19, 2019, are timely under the three-year willful-violation period, and claims accruing after August 19, 2020, are timely under the two-year default period. Signature's motion for summary judgment on Gomez's FLSA claims based on the written-consent issue is denied.

### ii

Signature also argues that Gomez falls within an exempt classification. Signature classifies her as a driver's helper. Doc. 230 at 25; Doc. 236 at 10. It is undisputed that Gomez worked for Signature from approximately February 2021 until June 2022. Doc. 231 at 5, ¶ 28. She did not drive. *Id.* at 5, ¶ 30. She was required to ride in Signature's trucks alongside its drivers to get to and from job sites. *Id.* at 5, ¶ 33; Doc. 230 at 9, ¶ 30. Between job sites, she—like presumably every

other laborer on site—put rakes, shovels, and wheelbarrows back into the truck. Doc. 231 at 5, ¶ 33. Whether items were secure was the driver's responsibility, not hers. *Id.* She did not load anything at the beginning of each day; the crew leader handled that and was responsible for ensuring it was secured. *Id.* at 5–6, ¶¶ 33–34. She does not know what a Driver's Vehicle Inspection Report is, though she acknowledges that she had seen a driver complete them. *Id.* at 6, ¶ 34. Other than confirming her seatbelt worked, she did nothing to ensure the vehicle was safe to drive. Doc. 231 at 6, ¶ 34. She never placed safety cones. *Id.* She never helped the driver back into locations or park. *Id.* She is not familiar with any company safety policies. *Id.* She stated she was focused only on her own safety. *Id.* Her only connection to vehicle safety was occasionally telling the driver whether lights were working. Doc. 231 at 8, ¶ 37.

On this record, Gomez's uncontroverted testimony establishes that she performed no driving, no vehicle inspections, no morning loading, no cone placement, no backing assistance, and no traffic direction. The only safety-adjacent activity in the record is occasionally telling the driver whether lights worked. This in no way suggests that a "substantial part" of her work constituted safety affecting activity. This is precisely the sort of "trivial, casual or occasional" activity that falls outside the exemption. *Pyramid*, 330 U.S. at 708. Signature has not carried its burden of proving that Gomez—as a matter of law—falls within the driver's helper classification or any other exempt classification.

Signature's argument for the exemption's applicability to Gomez has two parts. First, it contends that the driver's helper classification turns simply on whether the employee was "required to ride on a motor vehicle," and Gomez concedes she was. Doc. 230 at 25–26; Doc. 236 at 11–12. Second, it argues that even if Gomez did not personally perform safety-affecting tasks, she "could have been called upon" to do so, pointing to evidence that other non-driving crew members assisted with backing, placed cones, directed traffic, and helped with inspections. Doc. 230 at 12–13, ¶ 37; Doc. 236 at 11–12.

Neither argument carries Signature's burden. As noted, the driver's helper classification as defined in 29 C.F.R. § 782.4 is a DOL regulation that deserves no deference. And even the nonbinding DOL regulation on which Signature relies distinguishes between an employee who rides on a vehicle as a matter of fixed duty to assist the driver and one who rides "merely as a convenient means of getting himself to,

from, or between places where he performs his assigned work." 29 C.F.R. § 782.4(a), (c). Gomez rode on Signature's trucks for the sole purpose of getting to job sites where she performed manual landscaping. She performed no duties on or in connection with the vehicle during transit. That precludes Signature's request for summary judgment. *See Dingman v. Cart Shield USA, LLC*, No. 12-81086, 2013 WL 961024, at *6 (S.D. Fla. Mar. 12, 2013) (denying summary judgment where "there is nothing in the record that explains what, if anything, he did to assist the driver so as to qualify as a driver's helper"); *Gomez*, 2025 WL 1262463, at *9 (finding genuine dispute as to whether landscape company's non-drivers were required to ride on trucks in a safety-related capacity rather than merely for transportation).

As for the "could have been called upon" standard, it fails here for the same reasons discussed above in connection with Valdez. But even if it were applicable, Signature points to no evidence that Gomez specifically could have been called upon to perform any safety-affecting duties. It points instead to what other non-drivers did. Doc. 230 at 10–11, ¶ 37. Gomez's own uncontroverted testimony is that she did none of those things, was not trained in any of them, and did not know they were expected of her. Doc. 231 at 6, ¶ 34; Doc. 231 at 11, ¶ 39. Signature's own job postings, H-2B visa applications, and Kansas-Works.com listings describe no helper or safety-related duties for landscape laborers like Gomez. Doc. 231 at 13–14, ¶¶ 1–3. And Signature's written Vehicle Operation Standards policy assigns load security responsibility to the driver, not to non-driving crew members. Doc. 224-3, at 138:14–139:12; Doc. 231 at 10–11, ¶ 38.

Nothing here indicates that Signature is entitled to judgment as a matter of law on the applicability of the Motor Carrier Act exemption to Gomez. Thus, its motion on this issue is denied.

**c**

For the third issue, Signature moves for summary judgment on Valdez and Gomez's individual claims under the Missouri Minimum Wage Law on two independent grounds. Doc. 230 at 30–31. The first rests on Mo. Rev. Stat. § 290.505.3, which provides that the Missouri Minimum Wage Law's overtime requirements "shall not apply" to employees exempt from overtime under the FLSA. Signature's argument is a straightforward syllogism: the Motor Carrier Act exemption applies to Valdez and Gomez; the Missouri Minimum Wage Law incorporates FLSA exemptions; therefore the Missouri Minimum Wage Law does

not require overtime for Valdez and Gomez. It thus necessarily fails at summary judgment.

The second ground is the presumption against extraterritoriality issue concerning the Missouri Minimum Wage Law previously discussed. Doc. 230 at 28–29. That argument fails for the reasons set forth in the class certification analysis. Thus, Signature's motion for summary judgment on Valdez and Gomez's Missouri Minimum Wage Law claims is denied.

**d**

Finally, Signature moves for summary judgment on willfulness, seeking to limit the FLSA lookback period to two years. Doc. 230 at 31–33. The FLSA's default statute of limitations is two years. 29 U.S.C. § 255(a). That period extends to three years, however, if the employer's violation was "willful," which means the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The distinction matters here because some opt-in plaintiffs have claims that are timely only under the three-year period.

The plaintiffs bear the burden of proving willfulness. *Donovan v. M & M Wrecker Service, Inc.*, 733 F.2d 83, 85 (10th Cir. 1984). And in the Tenth Circuit, willfulness is a mixed question in which "factual issues predominate," *Pabst v. Oklahoma Gas & Electric Co.*, 228 F.3d 1128, 1137 (10th Cir. 2000). Signature contends that it is entitled to summary judgment because the uncontroverted evidence precludes a finding of willfulness. The evidentiary record rejects that argument.

To be sure, Signature has presented evidence of non-willfulness. It has classified all landscape laborers as Motor Carrier Act exempt since 1989 based on legal advice received at the company's founding, Doc. 220-2 at 16:20–25, and two independent law firms subsequently confirmed the classification, Doc. 220-48 at No. 5. The DOL's Wage and Hour Division audited Signature in 2021, reviewed pay data for all field employees, interviewed employees in field roles, and determined that Signature had not violated the FLSA. Doc. 220-48 at No. 3; Doc. 25-2 at 4–10. *In Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1183, 1190 (N.D. Okla. 2006), the court granted summary judgment on willfulness based on a comparable DOL finding. But *Zachary* is distinguishable: there, the plaintiffs "presented no evidence" to rebut the DOL finding. *Id.* The plaintiffs here have presented notable countervailing evidence.

The plaintiffs have produced evidence that, if believed, may support a finding of willfulness. Most significant are Signature's H-2B representations. Signature repeatedly represented to the DOL on applications signed under penalty of perjury that landscape laborers would be paid overtime while having no intention of doing so. Doc. 228 at ¶¶ 5–10, 25–30. Signature's founder acknowledged this under oath, testifying that the representations were made to get through DOL approval process quicker in order to get visas. Doc. 231-27 at 3, 87:18–87:23. A reasonable jury could conclude from this evidence alone that Signature knew its conduct was prohibited. *See Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1083 (8th Cir. 2000).

Corroborating the H-2B evidence is a 2017 advisory letter from Signature's attorneys that acknowledged the inconsistency between Signature's H-2B applications and its Motor Carrier Act exemption position and recommended adding safety-sensitive duties to future job orders. Doc. 231 at 12, ¶ 40; Doc. 231-27 at 7. Signature continued its practices for six more years. The plaintiffs also point to Signature's failure to conduct any time study of how much time its laborers spent on safety-affecting activities, Doc. 231 at 14, and to internal job postings and public KansasWorks.com postings that described overtime pay for landscape laborers, Doc. 231 at 31.

Signature's reliance-on-counsel evidence cuts both ways. Two law firms confirmed the Motor Carrier Act classification, which ordinarily weighs against a finding of willfulness because an employer that seeks and follows legal advice is generally not acting recklessly. *See Pabst*, 228 F.3d at 1137. But a 2017 letter from one of those firms did not simply confirm the classification, but it also acknowledged the inconsistency between Signature's H-2B representations and its Motor Carrier Act exemption position and recommended adding safety-sensitive duties to future job orders to address that inconsistency. Doc. 231 at 12, ¶ 40; Doc. 231-27 at 7. Viewed in the light most favorable to the plaintiffs, that letter is evidence that Signature knew that the inconsistency between its representations and its practices was legally problematic, yet continued the practice for six more years, which a reasonable jury could find constitutes reckless disregard of whether its conduct violated the FLSA. *McLaughlin*, 486 U.S. at 133. Thus, summary judgment on willfulness is denied.

### III

For the foregoing reasons, the pending motions are disposed of as follows:

**1.** Signature's Motion to Decertify the FLSA Collective, Doc. 219, is DENIED.

**2.** The plaintiffs' Motion for Rule 23 Class Certification, Doc. 217, is GRANTED. The following class is certified under Rule 23(b)(3):

> All landscape laborers who performed work in Missouri for Signature Landscape, LLC and were not paid overtime compensation for hours worked in excess of forty in a workweek during the class period.

> The class period extends three years prior to the filing of Doc. 217. Valdez is appointed as class representative. Brendan Donelon (Donelon, P.C.) and Ashley Atwell-Soler (Holman Schiavone LLC) are appointed as class counsel pursuant to Rule 23(g). Class notice shall issue in accordance with Rule 23(c)(2)(B). The parties shall meet and confer and submit a proposed notice plan within twenty-one (21) days of this Memorandum and Order.

**3.** The plaintiffs' Motion for Partial Summary Judgment on Quasi-Estoppel, Doc. 227, is DENIED.

**4.** Signature's Motion for Summary Judgment, Doc. 229, is DENIED in its entirety.

**5.** By no later than May 5, 2026, counsel for the parties should contact Chambers to discuss scheduling of a status conference the impact of this Memorandum and Order on the forthcoming trial.

It is so ordered.

Date: April 28, 2026

_s/ Toby Crouse_
Toby Crouse
United States District Judge